IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PETER CLARK,

       Plaintiff,

                                    Civ. No. 12-1160 MV/KBM

    v.

THE UNITED STATES OF AMERICA,

       Defendant.

               Consolidated for Briefing Purposes With

AILEEN O'CATHERINE, and
STEVEN SILVER, individually and as
Parents and next friends of NOAH SILVER,
a minor,

       Plaintiffs,

                                      Civ. No. 12-1176 MV/KBM

    v.

THE UNITED STATES OF AMERICA,

       Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on Defendant's Motion and Memorandum to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("First Motion") [Doc. 26 in Civ. No. 12-1160; Doc. 23 in Civ. No. 12-1176], and the United States' Motion and Memorandum to Dismiss Plaintiffs' Complaints for Lack of Subject Matter Jurisdiction ("Second Motion") [Doc. 27 in Civ. No. 12-1160; Doc. 24 in Civ. No. 12-1176].   The Court, having considered the motions, briefs,

1

relevant law and being otherwise fully informed, finds that Defendant's First Motion is not well-taken and will be denied, and Defendant's Second Motion is well-taken and will be granted.

## BACKGROUND

The incidents that give rise to these two actions occurred at the Capulin Snow Play Area, located in the Sandia Mountains range and within the management area of the Cibola National Forest.   Doc. 27-1 ¶ 3.[1]   The Capulin Snow Play Area was constructed in direct response to numerous snow play and traffic injuries that had occurred along the highways, where members of the public found unofficial and unsafe sites to engage in snow play activities.   Id. ¶¶ 4-10.   The purpose of the area was to provide a safer alternative for snow play and to "reduce extensive use of roadsides for snowplay activities," which "is extremely dangerous and many serious accidents [had] occurred in the past."   Doc. 27-3.   The slope of the Capulin Snow Play Area followed the natural slope of the hill.   Doc. 27-1 ¶ 21.   The Forest Service decided to operate Capulin without supervision, due to limited funding, and it continued to be operated without supervision at all relevant times.   *Id.* ¶ 22.   Improvements made to the area in 1989 and the early 1990's did not alter the snow play slopes.   *Id.* ¶ 32.   Neither the slope of the snow play area nor the run out had been altered at the time of the events in question.   *Id.* ¶ 34.

At all material times, the Forest Service posted at the entrance/pay station and made flyers available to the public notifying visitors that the area was operated with minimal supervision – to "participate at your own discretion and risk."   *Id.* ¶ 37.   Additionally, signs and flyers advised the public of safety rules, specifically directing the public to be aware of the elements of risk in snow play activities, observe signs and warnings, look around before starting down the hill, and maintain

---

[1] References herein use the docket numbers in *Clark*, 12cv1160.

control in order to avoid people and objects.   *Id.* ¶ 38.   Signs also informed the public that it was the individual sledder's responsibility to avoid collisions.   *Id.* ¶ 39.

The Forest Service visited the Capulin Snow Play Area on a daily basis when the facility was scheduled to be open to assess the amenities and observe the conditions of the slope.   *Id.* ¶ 43. During the daily visit, the Forest Service cleared trash, removed or mitigated large human-made jumps and natural moguls, checked general snow conditions, and determined whether to open the area to the public for that day.   *Id.* ¶ 44.

In October 2007, an Environmental Assessment was undertaken at Capulin.   Doc. 38-17. The Assessment states that the sliding areas at Capulin were "too steep allowing to[o] much speed and create[d] . . . unsafe . . . and hazardous conditions for the public."   Doc. 38-17.   Although the Forest Service began planning to renovate Capulin as early as 2005, due to competing demands on Forest Service resources, renovation did not begin until May 2010.   Doc. 27-1 ¶¶ 53, 56.

On January 31, 2010, Plaintiff Peter Clark sustained serious injuries to his back and ankle while sledding with his son at the Capulin Snow Play Area.   Additionally, on December 27, 2009, Noah Silver, the 12 year-old child of Plaintiffs Aileen O'Catherine and Steven Silver, sustained spinal cord injuries resulting in partial paralysis, a need for multiple surgeries, and other serious life changing injuries while sledding at the Capulin Snow Play Area.   As a result of his injuries, Plaintiff Clark filed, under the Federal Tort Claims Act ("FTCA"), a Complaint for Personal Injury on November 12, 2012, alleging a negligence claim against the United States.   Similarly, as a result of Noah's injuries, Plaintiffs O'Catherine and Silver filed, under the FTCA, a Complaint for Personal Injury and Loss of Consortium on November 15, 2012, alleging both a negligence claim and a claim for loss of consortium against the United States.

3

In their Complaints, Plaintiffs allege that the Forest Service breached its duty to exercise ordinary care such that the Capulin Snow Play Area was reasonably safe for public use and its duty to warn the public of hidden dangers.   In support of those allegations, Plaintiffs specifically allege that the Capulin Snow Play Area was operated without supervision; the man-made pitch to the sled area allowed sleds to travel at an unsafe speed and contained insufficient "run out" to allow sleds to safely slow down and stop; and Forest Service employees knew that the public was violating the rules for use and occupancy of the area.

On July 31, 2013, the government filed its First Motion and its Second Motion, each of which Plaintiffs oppose.   In the First Motion, the government argues that dismissal is warranted because: (1) Plaintiffs allege only violations of federal law, rather than state tort law, and such violations are not cognizable under the FTCA; and (2) to the extent Plaintiffs allege state tort law claims, those claims are foreclosed by the New Mexico Ski Safety Act.   In the Second Motion, the government argues that Plaintiffs' claims fall within the "discretionary function" exception to the FTCA.   Plaintiffs oppose both motions.

## LEGAL STANDARD

I.    Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."   *Henry v. Office of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir. 1994) (citations omitted).   Plaintiff bears the burden of establishing this Court's jurisdiction over its claims.   *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).   Before considering the merits of a case, the Court is responsible for ensuring that it has subject matter jurisdiction.   *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992).

4

Under Rule 12(b)(1), a party may assert by motion the defense of the Court's "lack of subject-matter jurisdiction."   Fed. R. Civ. P. 12(b)(1).   Motions to dismiss for lack of subject matter jurisdiction "take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which the subject matter jurisdiction is based."   *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). On a facial attack, the Court considers the complaint's allegations to be true.   *Id.*   On the other hand, when the motion challenges the factual basis for an action, the Court "may not presume the truthfulness of the complaint's factual allegations."   *Campos v. Las Cruces Nursing Ctr.*, No. CIV 11-0096, 2011 WL 5238921, *4 (D.N.M. Sept. 30, 2011) (citation omitted).   Rather, the "court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."   *Id.*   Reference to evidence outside the pleadings does not convert the motion to a summary judgment motion.   *Id.*

## II.   Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

Under Rule 12(b)(6), a Court may dismiss a complaint for "failure to state a claim upon which relief can be granted."   Fed. R. Civ. P. 12(b)(6).   "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint."   *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994).   When considering a 12(b)(6) motion, the Court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.   *Smith v. United States*, 561 F.3d 1090, 1097 (10th Cir. 2009), *cert. denied*, 130 S. Ct. 1142 (2010).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."   *Ashcroft v. Iqbal*, 556 U.S.

5

662, 678 (2009) (citations omitted).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*   A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Accordingly, while the Court must take all of the factual allegations in the complaint as true, "a plaintiff armed with nothing more than conclusions" cannot survive a motion to dismiss.  *Iqbal*, 556 U.S. at 679.

III.   <u>Rule 56 Motion for Summary Judgment</u>

  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).   Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id*. at 248.

  Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993) (citations omitted).   The moving party need not negate the nonmovant's claim, but rather must show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex v. Catrett*, 477 U.S. 317, 325 (1986).   Once the moving party meets its initial burden, the nonmoving party must show that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  *Applied Genetics Int'l Inc. v. First Affiliated Secs., Inc*., 912 F.2d 1238, 1241 (10th Cir. 1991) (citation omitted).   The nonmoving party cannot rely upon

conclusory allegations or contentions of counsel to defeat summary judgment, *see Pueblo v. Neighborhood Health Ctrs., Inc.*, 847 F.2d 642, 649 (10th Cir. 1988), but rather must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citation omitted).

Upon a motion for summary judgment, the Court "must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence." *Kaus v. Standard Ins. Co*., 985 F. Supp. 1277, 1281 (D. Kan. 1997), *aff'd*, 162 F.3d 1173 (10th Cir. 1998).   If there is no genuine issue of material fact in dispute, then a court must next determine whether the movant is entitled to judgment in its favor as a matter of law.  *See, e.g*., *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996); *Celotex*, 477 U.S. at 322.

## DISCUSSION

I. <u>First Motion</u>

    A. <u>Whether Plaintiffs Allege Claims Cognizable Under the FTCA</u>

The FTCA waives the sovereign immunity of the United States in its district courts for tort claims "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."   28 U.S.C. § 1346(b)(1)).   The FTCA "does not itself create a substantive cause of action against the United States; rather, it provides a mechanism for bringing a state law tort action against the federal government in federal court."   *Lomando v. United States*, 667 F.3d 363, 372 (3d Cir. 2011).   Thus, the extent of the government's liability under the FTCA is determined by state law.   *Id.*

7

Further, the government "is liable only to the extent that in the same circumstances the applicable local law would hold a 'private person' responsible." *Id.* (citing 28 U.S.C. § 1346(b)(1)). Specifically, the United States is answerable under the FTCA "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "[F]ederal statutory duties regarding peculiarly administrative acts generally involve a type of conduct that private persons could not engage in, and hence could not be liable for under local law." *United States v. Agronics Inc.*, 164 F.3d 1343, 1346 (10th Cir. 1999) (citation omitted). Accordingly, "[i]t is virtually axiomatic that the FTCA does not apply where the claimed negligence arises out of the failure of the United States to carry out a federal statutory duty in the conduct of its own affairs." *Id.* at 1345 (citation omitted).

In its opening brief, the government argues that the sole basis for Plaintiffs' claims is the Forest Service's violation of federal law, as set forth in the United States Department of Agriculture Forest Service Manual ("FSM"), and thus that Plaintiffs have failed to allege that a private person in similar circumstances would be liable under New Mexico tort law. Because a private owner or occupier of land has no duty to comply with the FSM, the government's argument continues, Plaintiffs' reliance on alleged violations of the FMS cannot provide a basis for Plaintiffs' claims, and those claims thus must be dismissed for lack of subject matter jurisdiction. While acknowledging that their Complaints include references to the FSM, Plaintiffs assert in their response that their claims are based on the government's alleged breach of its duties, as an owner or occupier of land, to exercise ordinary care to keep the Capulin Snow Play Area safe for use by visitors. In so doing, Plaintiffs argue, they have appropriately alleged liability of the government under New Mexico tort law in the same manner and to the same extent as a private landowner under like circumstances. In its reply brief, the government concedes that a private owner or

occupier of land is under a duty of care, and that to the extent Plaintiffs' claims are based on such a

duty, those claims are not subject to dismissal.

Based upon its reading of the Complaints, the Court finds that Plaintiffs' claims are based

on the alleged breach of the government's duties as an owner or occupier of land, rather than on the

government's alleged failure to comply with the FSM.   It is readily apparent that Plaintiffs

included in their Complaints allegations regarding the FSM for the sole purpose of anticipating the

government's arguments regarding the applicability of the discretionary function exception to the

FTCA, which were sure to follow.   Because the Complaints state with sufficient clarity that

Plaintiffs' claims are based on allegations that the government breached its ordinary duty of care as

an owner or occupier of land, the government's motion to dismiss Plaintiffs' claims for lack of

subject matter jurisdiction will be denied.

B.   Applicability of the New Mexico Ski Safety Act

The New Mexico Ski Safety Act (the "Act") provides "the sole remedy for an action based

in tort" against a ski area operator.   *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 855 (10th Cir.

1996).   In other words, "no action shall lie against a ski area operator unless the operator violates

the Act and that violation is the proximate cause of the skier's injury."   *Id.*   Under the Act, "a

skier 'accepts as a matter of law the dangers inherent in that sport insofar as they are obvious and

necessary.'"   *Philippi v. Sipapu, Inc.*, 961 F.2d 1492, 1494 (10th Cir. 1992) (quoting NMSA

1978, § 24-15-10(B)).   Specifically, "a skier 'expressly assumes the risk of and legal

responsibility for any injury to person or property which results from participation in the sport of

skiing, in the skiing areas, including any injury caused by . . . variations in terrain; surface or

subsurface snow or ice conditions; bare spots, rocks, trees or other forms of forest growth or

debris.   *Id.* (quoting NMSA 1978, § 24-15-10(B)).   Further, "[r]esponsibility for collisions by

9

any skier while actually skiing, with any person or object, shall be solely that of each individual

involved in the collision."   NMSA 1978, § 24-15-10(C).

The government argues that the Act applies equally to "sledders," and thus controls

Plaintiffs' tort claims here.   Those claims, the government further argues, are based on Plaintiffs'

allegations that the government failed to identify, correct, or warn of the unsafe pitch and run out

of the sledding slope.   According to the government, those allegations fail to state a claim under

the Act, because the pitch and run out of the slope are variations in terrain and/or surface or

subsurface snow or ice conditions, and under the Act, the sledder assumes the risk of and legal

responsibility for any injury caused by such terrain or conditions.   The government similarly

argues that Plaintiffs' claims arising out of the collision between Noah and other sledders also are

foreclosed by the Act, which places responsibility for such collisions solely on the sledder himself.

In response, Plaintiffs argue that, at the time of the subject injuries, neither Noah nor Peter

Clark was participating in the sport of skiing, and the government was not acting as a "ski area

operator."   Accordingly, Plaintiffs argue, based on the plain language of and the legislative intent

behind the Act, the Act is inapplicable to this case, where sledders (not skiiers) were sledding (not

skiing) in a snow play area (not in a ski area).   Because the Act is inapplicable, Plaintiffs' contend,

the Act provides no basis for dismissal of the Complaints.

"In interpreting a statute, the Court's primary goal is to ascertain and give effect to the

intent of the legislature."   *Starko, Inc. v. N.M. Human Servs. Dep't*, __ P.3d __, 2014 WL

4179967, *4 (N.M. 2014) (citation omitted).   The Court must "examine the plain language of the

statute as well as the context in which it was promulgated, including the history of the statute and

the object and purpose the Legislature sought to accomplish."   *Id.* (citation omitted).   Further, the

Court "avoid[s] adoption of a construction that would render the statute's application absurd or

unreasonable or lead to injustice or contradiction." *Id.* (citation omitted).   Here, the Court finds

nothing in the Act itself or the case law interpreting it to suggest that the legislature intended for

the Act to extend to the facts of the instant case. Accordingly, the Court need not reach the issue of

whether, under the Act, Plaintiffs' claims would be foreclosed.

The legislature identified the purpose of the Act as protecting individuals "from

unnecessary hazards in the operation of ski lifts and passenger aerial tramways and to require

liability insurance to be carried by operators of ski lifts and tramways."   NMSA 1978, § 24-15-2.

To that end, the Act defines those areas of responsibilities and affirmative acts for which "ski area

operators" shall be liable for injury, and those risks which the "skier or passenger" expressly

assumes.   *Id.*   The term "ski area operator" is defined as an entity that "has operational

responsibility for any ski area or ski lift."   NMSA 1978, § 24-15-3.   In turn, "ski area" is defined

as the property owned, permitted, leased or under the control of the ski area operator."   *Id.*

"Skiers" are defined as persons who are "on skis and present at a skiing area under the control of a

ski area operator for the purpose of engaging in the sport of skiing by utilizing the ski slopes and

trails." *Id.*   "Passengers" are defined as persons "lawfully using a ski lift."   *Id.*

It is undisputed that the Capulin Snow Play Area had no ski lifts or passenger aerial

tramways.   The government argues that the absence of a ski lift is immaterial, as the Act defines a

"ski area operator" as one responsible for either a ski lift or a ski area.   But a "ski area" is defined

only as an area under the control of a "ski area operator."   The two definitions thus are circular,

and provide no support for the government's argument that a "snow play" area designed for

sledding is in fact a "ski area" for purposes of the Act.

Also in support of its argument, the government points to the fact that the Act defines

"skiing" as "participating in the sport in which a person slides on snow, ice or a combination of

snow and ice while using skis," and in turn defines "skis" as "any device used for skiing," including "tubes, sleds or any other device used to accomplish the same or a similar purpose to participate in the sport of skiing."   These definitions, too, are self-referential.   Moreover, they presuppose that the skier -- regardless of what device he or she is using – is in a "ski area" under the control of a "ski operator."   All of the definitions cited by the government thus beg the question of whether one who is on a sled, in a snow play area designed for sledding, is "skiing" for purposes of the Act.

The Act, however, does make clear that it is intended to apply to skiers who are "utilizing the ski slopes and trails."   Here, neither Mr. Clark nor Noah was utilizing a ski slope or trail. Further, the purpose behind the Act is clearly stated:   to protect against the negligent operation of ski lifts and passenger tramways.   Here, the government was not operating either a ski lift or a tramway.   Rather, the government was operating a snow play area that disallowed skiing. Nowhere does the Act mention areas designated as "snow play areas," and indeed, the government has not cited (and the Court has not found) any cases in which courts have extended the Act to apply to cases where injuries occurred somewhere other than ski areas.

For all of these reasons, the Court finds that it would unreasonable to construe the Act to apply to the facts here.   Because the Act is inapplicable, the Court need not consider whether its terms would foreclose Plaintiffs' claims.   Accordingly, the government's motion to dismiss for failure to state a claim will be denied.

II.      Second Motion

      A.      Discretionary Function Exception to FTCA

The liability of the government under the FTCA is subject to certain exceptions, including the "discretionary function" exception at issue here.   Under that exception, the government is not

liable for:

> any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).   The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."   *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984).   "The exception applies even if the governmental employees were negligent."   *Aragon v. United States*, 146 F.3d 819, 822 (10th Cir. 1998).   Further, the exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his [or her] overall burden to establish subject matter jurisdiction."   *Id.* at 823 (citation omitted).

In *Berkovitz v. United States*, 486 U.S. 531, 526 (1988), the Supreme Court set forth a two-pronged test to determine whether the discretionary function exception applies to the challenged conduct.   "Since the exception covers only those acts 'involving an element of judgment or choice,' [the Court] must first determine if 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"   *Aragon*, 146 F.3d at 823 (quoting *Berkovitz*, 486 U.S. at 536).   The Tenth Circuit "requires the prescribed course of conduct to be specific and mandatory."   *Id.*   "If a federal statute, regulation or policy imposes specific, mandatory directives, conduct pursuant to those directives is not discretionary since 'the employee has no rightful option but to adhere to the directive.'"   *Id.* (quoting *Berkovitz*, 486 U.S. at 536).   On the other hand, "if the employee's conduct involves 'a matter of choice' or judgment, then the action is discretionary, and [the Court must] proceed to the second prong of [its] analysis."

13

*Id.* (quoting *Berkovitz*, 486 U.S. at 536).

Under the second prong of the *Berkovitz* test, the Court "must determine whether the exercise of judgment or choice at issue 'is of the kind that the discretionary function exception was designed to shield.'"  *Id.* (quoting *Berkovitz*, 486 U.S. at 537).   "Because the purpose of the exception is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy."  *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (citations omitted).   Accordingly, "the actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected."  *Id.*

For purposes of the second *Berkovitz* prong, "the very existence" of a regulation that allows the employee discretion "creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  *Id.* at 324.   In other words, "[w]hen established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Id.*   Thus, "[f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime."  *Id.* at 324-25.   In determining whether a complaint meets this test, "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."  *Id.* at 325.

14

B.        Application of the Discretionary Function Exception to the Instant Case

The government argues that the Complaints must be dismissed, because the allegations regarding the Forest Service's breach of its duties of care fall within the discretionary function exception.   According to the government, both prongs of the *Berkovitz* test are met, as: (1) there is no controlling statute, regulation or policy that imposes a specific, mandatory directive on the Forest Service; and (2) the actions of the Forest Service challenged by Plaintiffs are grounded in the policy considerations that are part and parcel of managing the National Forest.   Plaintiffs disagree, citing several provisions of the FSM and other documents that they argue to be mandatory, and contending that the challenged actions of the Forest Service are mundane "housekeeping matters" that do not implicate policy concerns, and thus are not shielded by the discretionary function exception.

1.        First Prong of the *Berkovitz* Test

The Court's "initial task in applying the *Berkovitz* framework to this case is to ascertain the precise governmental conduct at issue."   *Domme v. United States*, 61 F.3d 787, 790 (10th Cir. 1995).   Plaintiffs contend that the government is liable because the Forest Service failed to address the following hazardous conditions:   the angle of the slope of the sledding hill; the limited run out; the condition of the ice and snow; the lack of supervision (including allowing multiple users to be on the hill at the same time); and the lack of adequate warning.   According to Plaintiffs, the Forest Service was required to address these conditions based on the following sections of the FSM:[2]

---

[2] In addition to the FSM, Plaintiffs also cite to a Forest Service Order, a letter from the Forest Service to the Navajo Nation Historic Preservation Office, and the Cibola National Forest Land and Resource Management Plan ("Forest Plan:").   These documents are outside of the Forest Service "Directive System," which is the only place where Forest Service policies and procedures are issued.   FSM § 1103 (2006).   Accordingly, these documents cannot be read to impose

15

**2330.3 – Policy**

The basic recreation policies set forth at FSM 2303 and the following supplementary policies shall govern the development and administration of sites and facilities.   Where it is not possible to achieve the objectives to the degree defined in this chapter, close sites and facilities to public use.

* * *

2.      Develop sites and facilities that will provide recreation experiences toward the primitive end of the spectrum. . . .

* * *

5.      Seriously consider the element of cost efficiency when developing and operating sites and facilities.

6.      Establish priorities for the development and management of sites in the following order:

a.      Ensure public health and safety.

b.      Protect the natural environment of the site.

c.      Manage and maintain sites and facilities to enhance users' interaction with the natural resource.

* * *

**2331.1 – Regulations and Orders**

Clearly notify the public of the necessary conditions of occupancy and use at each individual site.   Signs must be positive in tone and explain the reasons for the regulations.

Initiate firm action against those who knowingly, willfully, or persistently violate the conditions of occupancy and use . . .

**Section 2331.5 – Site Closures**

There are two types of site closures:   permanent and temporary.

1.      Monitor sites to determine whether it is desirable to continue operation of the site or to close the site.   As part of this monitoring, consider:

mandatory requirements on the Forest Service.

      a.      The relationship of the site to other Forest Service sites. Are there other sites nearby that could satisfactorily serve the need?

      b.      The relationship of the site to other Federal, State, local, or private sites.   Could the private sector satisfactorily serve the need?

      c.      Other alternative recreation opportunities.

      d.      Total overall cost/benefit relationships.   Although many variables affect the costs of operating and maintaining sites, carefully consider keeping sites open when cost per visitor-day exceeds $1.50.

2.      Make every effort to stretch funds as far as possible to keep needed sites and facilities open to public use.   As part of this effort, consider:

      a.      Temporary or seasonal closures.

      b.      The use of volunteer and other human resource programs to staff and maintain sites.

      c.      User cooperation in keeping areas clean and sanitary. . . .

      d.      The users' health and safety and level of resource damage.

3.      Establish priorities under reduced funding levels by closing lesser-used sites and those sites that have alternative facilities nearby first.   Also consider reducing service or closing the site during the lesser-used portions of the week or season before full closure of the site.

4.      When sites are closed temporarily, install signs explaining why the site is closed and giving directions to the nearest available facilities.

5.      Close the site or facility when conditions reach the point that users' health or safety is jeopardized or unacceptable resource damage is occurring. . . .

**Section 2332.1 – Public Safety**

To the extent practicable, eliminate safety hazards from developed recreation sites. Inspect each public recreation site annually before the beginning of the managed-use season.   Maintain a public record of the inspections and corrective actions taken with a copy of the operation and maintenance plan.

Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.

17

**Section 2332.32 – Site Capacity**

Ensure that the capacity of the site matches the desired recreation opportunity spectrum class and the ability of the site to withstand use.

**2333.03 – Policy**

1.       Prepare site plans before construction, rehabilitation, or expansion of a site. Site plans must show the specific location and design of facilities and must provide for control of traffic, sanitation, public safety, site protection, grading, landscape planting, and use distribution.

FSM, §§ 2330.3, 2331.1, 2331.5, 2332.1, 2332.32, 2333.03 (2006).

The relevant inquiry is whether the controlling statutes, regulations and administrative policies mandated that the Forest Service maintain its snow play areas in any specific manner. *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997).   "If not, the Forest Service's decisions as to the *precise manner* in which to do so would clearly fall within the discretionary function exemption to the government's tort liability."   *Id.*

None of the guidelines to which Plaintiffs cite requires that a snow play area be maintained in any particular way.   There are no regulations that specify the required angle, run out, or ice and snow conditions of a sledding slope, or the level of supervision necessary at the hill.   Further, there are no regulations requiring the Forest Service to warn of the dangers of the sledding hill, nor that classify the hill as a "high priority hazard" requiring correction.

First, Plaintiffs cite to Section 2330.3, arguing that it imposes mandatory directives concerning persistent problems and conditions in directing the Forest Service to "close sites and facilities to public use" where it is not possible to achieve the objectives of the overall chapter governing publicly managed recreation opportunities, and to "ensure public health and safety." This provision clearly gives the Forest Service discretion to determine, in the first instance, whether it is indeed "not possible" to achieve the objectives of Chapter 2330.   *See Harich v.*

18

*United States*, 11 F. App'x 967, 967 (9th Cir. 2001) ("Although closure of areas to target shooting was required if certain conditions existed, the decision as to whether those conditions existed was a discretionary one.").

Further, Section 2330.3 directs the Forest Service to "establish priorities for the development and management of sites," with the goal of "ensur[ing] public health and safety" numbering first among those priorities. This provision speaks broadly, rather than specifically, of ensuring public safety; it does not mandate any specific course of action that the Forest Service must take in making public health and safety a first priority in developing and managing its recreation sites. *See Aragon*, 146 F.3d at 825; *Figueroa v. United States*, 64 F. Supp. 2d 1125, 1131 (D. Utah 1999). Indeed, as the government argues, it is untenable to interpret Section 2330.03 as mandating that the Forest Service guarantee the safety of the public, as the only way to accomplish such a goal would be to close its recreation sites entirely. Such a position not only is absurd, but also is in complete contravention of Congress's intent to make outdoor recreational opportunities available to the public. *See* 16 U.S.C. §§ 475, 528. For these reasons, Section 2330.03 does not impose specific and mandatory requirements on the Forest Service.

Second, Plaintiffs cite to Section 2331.1 and note that it mandates that the Forest Service "clearly notify the public of the necessary conditions of occupancy and use," and "initiate firm action against those who . . . violate the conditions of occupancy and use." Plaintiffs do not allege that the Forest Service failed to comply with these directives. Instead, Plaintiffs argue that the Forest Service did not put up signs stating that there was no supervision of the sledding area – an issue wholly separate from the "necessary conditions of occupancy and use." And while Plaintiffs allege that the Forest Service allowed users of the snow play area to sled down the hill, despite the obvious presence of other sledders on the trail, nowhere do Plaintiffs allege that the

19

Forest Service did not take action, firm or otherwise, against individuals who violated "the conditions of occupancy or use," or that the harm suffered by Noah and Mr. Clark was the result of any failure to take such action.   Because Section 2331.1 thus is inapposite to the precise governmental conduct at issue, it is irrelevant to the Court's determination of whether the discretionary function exception applies here.

Next, Plaintiffs cite to an excerpt from Section 2331.5, without providing any explanation for its applicability to their claims.   That provision instructs the Forest Service to "monitor sites to determine whether it is desirable to continue operation of the site or to close the site," and lists several factors for the Forest Service, in its discretion, to consider.   Further, Section 2331.5 instructs the Forest Service to "make every effort to stretch funds as far as possible to keep needed sites and facilities open to public use," and again lists several factors for the Forest Service, in its discretion, to consider, one of which is the "users' health and safety and level of resource damage." Finally, Section 2331.5 instructs the Forest Service to "close the site or facility when conditions reach the point that users' health and safety is jeopardized or unacceptable resource damage is occurring."   As an initial matter, Plaintiffs nowhere allege conduct that would amount to a violation of these instructions, and accordingly, Section 2331.5 is of questionable relevance. Moreover, each paragraph of this provision plainly gives the Forest Service discretion to make its own determination, based on a balancing of several factors, whether to close a site.   "This balancing of interests obviously involves the exercise of discretion by the Forest Service." *Marquez v. United States*, No. 95-S-346, 1996 WL 588918, *4 (D. Colo. Sept. 17, 1996).   Indeed, while the final paragraph mandates closure when conditions reach the point that health and safety are jeopardized or unacceptable resource damage is occurring, it nonetheless leaves for the Forest Service to decide, in its discretion, whether and when conditions reach that point.   *See Harich*, 11

F. App'x at 967.   Accordingly, Section 2331.5 does not impose specific and mandatory requirements on the Forest Service.

Additionally, Plaintiffs cite to Section 2332.1, which instructs the Forest Service, "to the extent practicable," to "eliminate safety hazards from developed recreation sites," and to "immediately correct high-priority hazards that develop or are identified during the operating season or close the site."   "To the extent practicable" "is a prime example of discretionary language, which gave [the Forest Service] a choice or judgment on what action to take, *if any*." *Aragon*, 146 F.3d at 824 (emphasis in original); *see also Rosebush*, 119 F.3d at 442 ("Decisions concerning what constitutes 'practicable' require the exercise of discretion which is protected by FTCA § 2680(a).").   Further, "[u]nder a plain reading of this provision, practicability limits both the extent to which the USFS is required to eliminate safety hazards and the immediacy with which the USFS must correct high-priority hazards."   *Tam v. United States*, 905 F. Supp. 2d 1221, 1230 (W.D. Wash. 2012).   Specifically, Section 2332.1 "requires the USFS to determine, within the confines of its many other responsibilities, how quickly to address high-priority hazards," and to use "its discretion and policy judgment to choose which items to treat as 'high-priority' from among the nearly limitless category of potential hazards" present in a National Forest area.   *Id.* at 1231; *see also Elder v. United States*, 312 F.3d 1172, 1178 (10th Cir. 2002) (holding that a National Park Service policy manual's "broad mandate to warn the public of and protect it from special hazards involves the exercise of discretion in identifying such hazards").   Notably, the discretion vested in the Forest Service under this provision "is not lessened by Forest Service knowledge of earlier accidents," as "[i]t is the governing administrative policy, not the [Forest Service's] knowledge of danger . . . that determines whether certain conduct is mandatory for purposes of the discretionary function exception."   *Rosebush*, 119 F.3d at 442.   Accordingly,

21

Section 2332.1 does not prescribe a specific and mandatory course of conduct which the Forest Service must take to ensure public safety.

Section 2332.1 also directs the Forest Service to inspect annually its recreation sites, before the beginning of the "managed use season," and to maintain a public record of those actions. Plaintiffs argue that these directives are mandatory, and that the Forest Service failed to comply with these directives.   This argument, however, misses the point, as the conduct alleged to be negligent and to have caused injury to Noah and Mr. Clark is unrelated to its failure to conduct or maintain records of annual inspections.   Because any failure of the Forest Service to perform its mandatory duties regarding annual inspections did not give rise to Plaintiffs' claims, the provisions of Section 2332.1 related to annual inspections is inapplicable to the Court's determination of the applicability of the discretionary function exception.

Finally, Plaintiffs cite to Sections 2332.32 and 2333.03, both of which involve the planning and design phase of a recreation site.   Specifically, Section 2332.32 directs that, in planning and designing a recreation site, the Forest Service must "ensure that the capacity of the site matches the desired recreation opportunity spectrum class and the ability of the site to withstand use."   In turn, Section 2333.03 provides that the Forest Service must prepare "site plans" before construction a site, and sets forth what those plans must include.   Plaintiffs, however, make no allegations regarding the initial planning and design of Capulin, or the failure of the Forest Service to properly follow either of these provisions in planning and designing the snow play area.   Further, Plaintiffs nowhere allege that the injuries suffered by Noah or Mr. Clark resulted from any such failures at the planning stages.   Indeed, in their response, Plaintiffs acknowledge immunity for design decisions, and indicate that their claims arise not from the original design and planning of Capulin, but rather from the maintenance of the snow play area.   Accordingly, neither Section 2332.32 nor

Section 2333.03 provides any basis for the Court to determine that the discretionary function exception is inapplicable to the challenged governmental conduct.

No statute, regulation or policy specifically prescribed a course of action for the Forest Service to follow in maintaining and supervising its snow play areas.   Accordingly, the conduct of the Forest Service in deciding how to address potentially hazardous conditions, including the angle of the slope of the sledding hill, the limited run out, the condition of the ice and snow, and the lack of supervision, was discretionary under the first prong of the *Berkovitz* test.

2.      Second Prong of the *Berkovitz* Test

Because the allegedly tortious conduct of the government involved a discretionary function, the Court must proceed to the second prong of the discretionary function analysis. Specifically, the Court must determine whether the discretion involved in the Forest Service's conduct – including the decisions as to how to warn of dangers involved in sledding at Capulin and whether and how to maintain and supervise the sledding hill – is the sort of conduct that the discretionary function exception was designed to shield.

Only decisions "susceptible to policy analysis" are protected by the exception."   *Gaubert*, 499 U.S. at 325.   "The pertinent inquiry is whether the decision implicates the exercise of a policy judgment of a social, economic, or political nature."   *Elder*, 312 F.3d at 1181 (citation omitted). Plaintiffs argue that it does not.   In particular, Plaintiffs argue that the Forest Service knew about the hazardous conditions of the sledding area and, given that knowledge, it had an absolute duty to warn of the hazards, ameliorate the hazards, or prohibit use of the area altogether.   *See*, *e.g.*, Doc. 38 at 18 ("Here, there is no public policy reason for the Forest Service to fail to enforce the requirement that it operate the Capulin Snow Play Area within its capacity limitations, especially when the conditions present on the sledding slopes were hazardous in light of the overcrowding,

fast speeds, iced-over slopes, and inadequate runoff.").   In essence, Plaintiffs contend that the decisions regarding the operation of Capulin involved no policy analysis because the sole relevant consideration was public safety.   In *Elder*, however, the Tenth Circuit specifically considered and rejected this very argument.   312 F.3d at 1181.

Much as the Court explained in *Elder* with regard to the National Park Service, the Forest Service "must weigh the cost of safety measures against the additional safety that will be achieved."   *Id.*   This is especially salient here, as the Capulin Snow Play Area was constructed in direct response to numerous snow play and traffic injuries that had occurred along the highways, where members of the public found unofficial and unsafe sites to engage in snow play activities. Doc. 27-1 ¶¶ 4-10.   The very purpose of the area was to provide a safer alternative for snow play and to "reduce extensive use of roadsides for snowplay activities," which "is extremely dangerous and many serious accidents [had] occurred in the past."   Doc. 27-3.

More importantly, the various policies that govern the Forest Service charge its employees with weighing a number of factors, including recreation opportunities, safety, environmental integrity, and resources.   These considerations are expressed in the governing statute, which makes clear that Congress established the National Forests "for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of the citizens of the United States" and "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."   16 U.S.C. §§ 475, 528.   Additionally, its Forest Plan makes clear that the "mission" of the Cibola National Forest "is to provide multiple use and sustained yield of goods and services in a way that maximizes long term net public benefits consistent with resource integration, environmental quality, and management considerations."   Doc. 27-8.   One of the goals listed as necessary to achieve that mission is to provide "dispersed and developed outdoor

recreation opportunities and enhance experiences by providing access, services, and facilities

consistent with other resource considerations." *Id.*   Further, the objectives of the FSM Chapter

2330, which governs here, are maximizing opportunities for visitors to know and experience

nature while engaging in outdoor recreation; developing and managing sites consistent with the

available natural resources to provide a safe, healthful, esthetic, non-urban atmosphere, and

providing a maximum contrast with urbanization.   FSM § 2330.2 (2006).   Finally, in vesting

discretion in the Forest Service to monitor recreation sites to determine whether it is desirable to

continue operation of the site or close the site, the Forest Service must consider the relationship of

the site to other sites, including whether other sites nearby could satisfactorily serve the need, other

alternative recreation opportunities, and costs, and must consider reducing service or part time

closures before full closure of the site.   FSM § 2331.5 (2006).

    In this case, the government contends that the decisions at issue – to maintain the natural

angle of the slope, operate the area without supervision, and post warning signs and distribute

informational flyers – involved the consideration of a number of factors, including: (1) the

allocation of limited resources among competing needs; (2) public accessibility to the Forest; (3)

the Forest Service goals of providing outdoor recreational opportunities and maximizing

opportunities for visitors to know and experience nature; (4) the environment, wilderness, visual

and natural resources; (5) safe and satisfactory alternative sledding areas; and (6) public safety.

    The extent of the evidence demonstrating that the Forest Service actually balanced these

factors is of no moment, as "[a]pplication of *Berkovitz's* second prong does not require proof of the

thought processes of the pertinent decisionmakers."   *Elder*, 312 F.3d at 1182.   Rather, the focus

of the inquiry is "on the nature of the actions taken and on whether they are susceptible to policy

analysis."   *Id.*   "The approach taken by the Supreme Court relies on objective factors."   *Id.*

Thus, where, as here, "established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  *Gaubert*, 499 U.S. at 324.   The Court must presume in this case that the decisions at the Capulin Snow Play Area are grounded in the policies discussed above.  *Elder*, 312 F.3d at 1182.

The Court recognizes that "the facts of [a] specific case may overcome the presumption to which the government is entitled under *Gaubert*," and that, "[i]n certain circumstances, it may be obvious that a decision implicates none of the public policies that ordinarily inform an agency's decisionmaking."  *Id.*   For example, in *Duke v. Dep't of Agric.*, the Tenth Circuit held that the discretionary function exception did not exempt the government's decision not to warn of falling rocks at a campground in the Gila National Forest.   131 F.3d 1407, 1412 (10th Cir. 1997).   In that case, the government conceded that "no economic factors influenced the decision or nondecision." *Id.*   Further, the Court found "a specific hazard distinct from other hazards generic to a national forest," caused by a cut "made through a mountainside resulting in a slope from which boulders rolled down from time to time."  *Id.*   Notably, "[n]o literature or signs warned against the hazard of the rolling boulders."  *Id.*   The Court "could discern no public policy (such as preserving natural beauty) that was implicated by the decision not to install a warning sign at the campground, which was located on the side of a road that also served as a parking lot."  *Elder*, 312 F.3d at 1182.

The circumstances of *Duke* are distinguishable from those here.   First, the Capulin Snow Play Area, while admittedly a developed recreation site, is not a parking lot.   The area is "classed as moderate to high in natural beauty," and clearing the area for snow play was expected to "create more wildlife openings and increase edge effect, thus enhancing certain wildlife habitat."   Doc. 27-3.   Further, the government has affirmatively defended its action or inaction on the basis of

26

economics, namely, the allocation of scarce funds, in addition to its consideration of both the

public's need for a safer alternative than the side of the highway for snow play and its mission to

maintain recreation sites in a natural, rather than an urban, state.   Accordingly, "[m]any of the

same interests are at stake as in cases recognizing the discretionary function exception as a defense

to claims arising out of dangers in the wilderness."   *Elder*, 312 F.3d at 1183 (citing *Kiehn v.

United States*, 984 F.2d 1100, 1105 (10th Cir. 1993) ("The decision not to post warning signs in

remote areas of a national monument inherently requires a balancing of public policy objectives,

such as resource allocation, visitor safety and scenic preservation.)"; *Johnson v. United States

Dep't of Interior*, 949 F.2d 332, 337 (10th Cir. 1991) (decisions regarding regulation of mountain

climbing in Grand Tetons "by their very nature . . . involve balancing competing policy

considerations pertaining to visitor safety, resource availability, and the appropriate degree of

governmental interference in recreational activity"); *Zumwalt*, 928 F.2d 951, 955 (10th Cir. 1991)

(decision not to warn of known hazards along trail through wilderness area of national monument

implicated protected policy decision to maintain trail in a wilderness state)).

Significantly, unlike *Duke*, this is not a case where the Forest Service failed to undertake

any action at all to protect or warn members of the public.   To the contrary, the Forest Service

posted warnings about the danger of snow play, informed visitors that the snow play area was

unsupervised, and admonished visitors to follow all rules.   Additionally, the Forest Service

checked Capulin every morning to decide whether to open the gate to the parking lot.   Forest

Service employees also made daily visits to Capulin when it was open to the public.

Finally, while the Forest Service knew of the hazards identified by Plaintiffs, namely, that

the hill was too steep, crowded, ice-covered, and had inadequate runoff, these hazards are not the

sort of "specific hazard . . . distinct from the multitude of hazards that might exist in, for example,

a wilderness trail through a national park or forest" discussed in *Duke*.   In *Duke*, the specific

hazard of falling boulders was caused by a cut made by the Forest Service when it created a road.

Here, the hazards at issue – the naturally occurring conditions of the sledding hill, in conjunction

with the presence of others making use of that hill – are generic hazards inherent in making use of

a wilderness trail in the forest.   Unlike *Duke*, this is simply not a case where the facts overcome

the presumption that the Forest Service's decisions were grounded in the myriad of policies that

gave the Forest Service discretion in the first instance.

> As the Court found in *Elder*, in the context of the Capulin Snow Play Area,
>
> one cannot isolate a particular . . . safety measure . . . and say whether its absence
> constitutes negligence.   The adequacy of one safety measure depends on what
> other safety measures have been taken.   If there is negligence, it is negligence in
> the design of the entire safety package.   Yet [the Forest Service] must judge the
> totality of the safety package in terms of its impact on other public policies besides
> safety.   Thus, it would be impossible to resolve Plaintiffs' negligence claims
> without evaluating decisions protected by the discretionary function.

312 F.3d at 1183-84.

The Court thus concludes that the second prong of the *Berkovitz* test has been satisfied, and

the government is entitled to the protection of the discretionary function exception.   *Id.* at 1184.

Accordingly, the government's motion to dismiss for lack of subject matter jurisdiction will be

granted.

## CONCLUSION

First, because the Complaints state with sufficient clarity that Plaintiffs' claims are based

on allegations that the government breached its ordinary duty of care as an owner or occupier of

land, the government's motion to dismiss Plaintiffs' claims for lack of subject matter jurisdiction

will be denied.   Next, because the New Mexico Ski Safety Act is inapplicable here, the Court need

not consider whether its terms would foreclose Plaintiffs' claims, and the government's motion to

dismiss for failure to state a claim will be denied.   Finally, because the government is entitled to the protection of the discretionary function exception to the FTCA, the government's motion to dismiss for lack of subject matter jurisdiction will be granted.

**IT IS THEREFORE ORDERED** that Defendant's Motion and Memorandum to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) or, in the Alternative, Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("First Motion") [Doc. 26 in Civ. No. 12-1160; Doc. 23 in Civ. No. 12-1176] is DENIED, and the United States' Motion and Memorandum to Dismiss Plaintiffs' Complaints for Lack of Subject Matter Jurisdiction ("Second Motion") [Doc. 27 in Civ. No. 12-1160; Doc. 24 in Civ. No. 12-1176] is GRANTED.

DATED this 25th day of September, 2014.

_____
MARTHA VÁZQUEZ
United States District Judge